YALE *v.* ELIZA ANN DEDERER.

In order to create a charge upon the separate estate of a married woman, the intention to do so must be declared in the very contract which is the foundation of the charge, or the consideration must be obtained for the direct benefit of the estate itself.

Accordingly, where a married woman signed a promissory note as mere surety for her husband, *held*, though it was her intention to charge her separate estate, such intention did not take effect.

The cases on this subject reviewed, and the ground upon which a charge is established stated, by SELDEN, J.

APPEAL from the Supreme Court. Action to obtain payment from the separate estate of a married woman, of the amount due upon a promissory note given by her husband for certain cows purchased by him, and which she joined him in signing. On the trial before one of the justices, without jury, it was proved that the plaintiff, when the appellant's husband offered to buy the cows, distrusted his solvency, and required him to procure his wife to unite in a note for the payment. This she did, and it was subsequently renewed by the note which was the foundation of this suit. At the time of signing it Mrs. Dederer remarked that if her husband was not able to pay it she was. It was admitted on the trial that Mrs. Dederer was the owner in fee simple absolute of sufficient real estate to satisfy this claim, and that she became seised in fee thereof subsequent to the acts of 1848 and 1849. It was not stated by the judge in his finding of facts, whether her estate was legal or equitable, nor when it accrued. The judge stated in his finding, "the defendant, Mrs. Dederer, intended to charge and did expressly charge her separate estate for the payment of the note, as I find from the evidence in the case." Upon his direction judgment was entered for the sale of sufficient of the separate estate to satisfy the plaintiff's demand, and this judgment having

been affirmed at general term in the sixth district, Mrs. Dederer appealed to this court.

*Henry M. Hyde,* for the appellant.

*Henry R. Mygatt,* for the respondent.

SELDEN, J. The judge before whom this cause was last tried has found that the defendant, in giving the note upon which the action was founded, intended to charge her separate estate with its payment. In this respect only does the case, as now presented, differ from the same case when previously here (18 N. Y., 265). For, although the judge has also found, in his specification of facts, that she did charge her estate, yet this is a mere statement of the legal effect of the defendant's acts, and would have found a more appropriate place among the conclusions of law, drawn by the judge from the facts proved.

It does not expressly appear from the statement of facts, whether the title of the defendant to her separate estate was acquired before or after the acts of 1848 and 1849, nor consequently whether that title was legal or equitable. It is, perhaps, to be inferred from the form of expression used by the judge in describing the defendant's estate, viz.: "A separate estate *consisting of three farms,*" that it was a legal estate acquired subsequently to the passing of these acts. This, however, is immaterial, it having been settled, when this case was formerly here, that the statutes of 1848 and 1849 did not remove the general disability of married women to bind themselves by their contracts; but that the power conferred by those statutes, to hold to their separate use, and to convey and devise all their real and personal estate as if unmarried, carried with it the power to charge such estate substantially in the manner and to the extent previously authorized by the rules of equity in respect to separate estates.

To dispose of this case, therefore, we have only to ascertain whether a married woman having, prior to the statutes of 1848 and 1849, a separate equitable estate, could create a charge

upon that estate, by giving a promissory note for the debt of her husband, intending thereby to charge her estate, but without indicating this intention in any manner by the contents of the note.  It was settled, when the case was here before, that the bare giving of such a note did not bind the estate.  It becomes necessary now to inquire whether the additional fact, that the wife, at the time of making the note, intended to charge her separate estate, changes the rule.

Much has been said, in the course of the decisions on this subject, in regard to the intention of the wife at the time of making the contract; and in order properly to appreciate the force of these remarks, a brief retrospect of the law of separate estates is required.  I shall not attempt a review of the cases, confused and contradictory as some of them are, but desire to call attention to one or two features of the controversy carried on in the English courts for nearly a century, and which can hardly even now be considered as ended, in regard to the effect of the contracts of married women upon their separate estates. If the instrument by which the estate was created, conferred upon the wife either a general or qualified power of disposition, no one ever questioned her rights to execute this power; the doubts which arose, related to her right to dispose of or charge the property, independently of any such special authority; and this right was established soon after the introduction of such estates, upon the ground that the right of disposal was a necessary incident of the right of property.

That this universal *jus disponendi* was the sole and only foundation of the right in question is clear.  Lord THURLOW, in the case of *Fettiplace* v. *Gorges* (3 Bro. C. C., 8), places the right upon this ground, and no other basis has ever been suggested for it.  Assuming this then to be the foundation of the right, it is plain that the wife, to avail herself of it, must make some disposition of the specific property itself.  It is clearly impossible to deduce, from the *jus disponendi*, which accompanies all rights of property, power to make any contracts, except such as related directly to the property to which the right of disposition is attached; and yet the Master of the Rolls, in *Norton*

v. *Turvill* (2 Pr. W., 144), and in *Standford* v. *Marshall* (2 Atk., 69), held the separate estate of a married woman liable for the payment of her bond, although the bond in no manner referred to such separate estate ; and in the latter case was given for money lent to the husband.

The reasoning upon which these cases are said to have proceeded, and upon which they were followed by Lord THUR-LOW, was this: That it being the rule in equity, that a wife who had a separate estate might deal with such estate in the same manner as if she were *sole:* it followed that such estate was liable for her engagements, in the same manner as it would be if she were a *feme sole.* The equitable rule, which being founded entirely in the right of the wife to dispose of her property, could go no further than to allow her to make contracts specifically appropriating or charging her separate estate, was thus expanded, so as to enable her to contract generally without in any manner referring to such estate. The doctrine was justly characterized by Chancellor KENT in the case of *The Methodist Episcopal Church* v. *Jaques* (3 John. Ch., 77), where, speaking of the two cases to which I have referred, among others he says: "It is difficult to perceive upon what reasoning or doctrine the bond or parol promises of a *feme covert* could for a moment be deemed valid. She is incapable of contracting, according to the 'common right,' mentioned by Lord MAC-CLESFIELD ; and if investing her with separate property, gives her the capacity of a *feme sole*, it is only when she is directly *dealing with that very property*. The cases do not pretend to give her any of the rights of a *feme sole* in any other view, or for any other purpose."

But, although Lord THURLOW followed, as we have said, what he supposed to be the rule established by the cases referred to, he nevertheless saw the fallacy upon which those cases were based, as appears by his remarks in the case of *Hulme* v. *Tenant* (1 Bro. C. C., 16), the leading case on this subject. There the separate estate of a wife was held liable for the payment of her bond given for money borrowed, part of which had been borrowed by her husband, and the residue by herself.

After referring to the previous cases, Lord THURLOW says:
"I take it, therefore, it is impossible to say, but that a *feme covert* is competent to act as a *feme sole* with respect to her separate property, when settled to her separate use: but the question here goes a little beyond that; it is not only how far she may act upon her separate property; I have no doubt about that; but the question is, how far her *general personal engagements* shall be executed out of her separate property." Still, although thus clearly seeing the distinction which ought, as it would seem, to have been decisive against the claim; he, nevertheless, yields to the authority of the previous cases, and holds the separate estate liable.

The debt in the last case, as well as in the previous cases of *Norton* v. *Turvill*, and *Standford* v. *Marshall*, was by bond. But it is obvious, that if the principle upon which they were based was sound, it embraced every debt of the wife, however created; whether by bond, note, or by a mere oral promise; and so the doctrine was subsequently applied by Lord THURLOW himself in the case of *Lilia* v. *Airey* (1 Ves., 277). It is true, that in this case the separate estate consisted of a specific sum allowed by the husband to the wife, by way of separate maintenance, and resort has been sometimes had to that fact as explaining the decision. But no reliance is placed upon this circumstance by Lord THURLOW, nor could it properly affect the result. The decision was the legitimate consequence of the theory of the wife's liability adopted in the previous cases.

But the unsoundness of this theory was soon discovered, and it was rejected two years afterwards, in the case of *Bolton* v. *Williams* (2 Ves., 138), by Lord Chancellor LOUGHBOROUGH, who denied the liability of a married woman's separate estate for her general parol engagements, and explained the previous cases upon the ground, that the securities which the wife had executed operated as appointments of her separate property, that is, as appropriations or pledges of such property for the payment of the debt for which the security was given.

This new theory that a written security was an appointment was as plainly erroneous as that for which it was substituted.

It was evidently a pure fiction. The doctrine proceeded upon the assumption that a wife's separate estate is not liable for her general engagements, but only for such as are specifically charged upon it, and yet held it liable for a bond or note, which in no manner referred to such estate. If these written securities operated as appointments, then it must necessarily follow that every such security would create an equitable charge or lien upon the estate, from the time of its execution; still, they were uniformly treated not as specific liens, but as mere general debts, having no priority over other and later claims. It was expressly held by Sir JOHN LEACH, Master of the Rolls, in an anonymous case (18 Ves., 258), where the questions arose, that in such cases there was no priority, and that all the debts must be paid equally.

But, notwithstanding these inconsistencies, this doctrine that a written security was an appointment and a charge, while it was otherwise with a mere parol promise, was maintained substantially unchanged, from the time of its introduction by Lord LOUGHBOROUGH, in *Bolton* v. *Williams*, until the case of *Murray* v. *Barlee* (4 Sim., 82), when Lord BROUGHAM rejected the distinction between a written security, and a promise by parol, and extended the rule so as to make the mere parol engagements of a wife a charge, as well as her bond or note. Speaking on that subject, he says: " I own I can conceive no reason for drawing any such distinction. If, in respect of her separate estate, the wife is in equity taken as a *feme sole*, and can charge it by instruments absolutely void at law, can there be any reason for holding that her liability, or more properly, her power of affecting the separate estate, shall only be exercised by a written instrument? Are we entitled to invent a rule, to add a new chapter to the statute of frauds, and to require writing where the act requires none? Is there any equity reaching written dealings with the property which extends not also to dealing in other ways, as by sale and delivery of goods? Shall necessary supplies for her maintenance not touch the estate, and yet money furnished to squander away at play, be a charge on

it, if fortified by a scrap of writing? No such distinction can be taken upon any conceivable principle."

It is impossible to deny the force and conclusiveness of this reasoning. The distinction which it combats, was clearly untenable. But the learned Chancellor was, I think, less successful in another part of the same opinion in which he attempts to explain the ground upon which it had been previously held, that the bond or note of a married woman, and upon which he held that all her engagements, whether in writing or by parol, were charged upon her separate estate. He says, that although originally the courts supposed that, to affect the separate estate, there must be some real charge, as a mortgage, or an instrument amounting to the execution of a power, afterwards the intention of the wife "was more regarded, and the court only required to be satisfied that she *intended* to deal with her separate property." The reasoning by which her intention was supposed to be established was, that when a married woman gives her bond or note, or contracts a debt in any other manner, it must be presumed that she intended it to have some effect; and inasmuch as it is void at law, and can have no effect unless it is a charge upon her separate estate, it follows that she must intend it to be such a charge.

The intention here spoken of is not an intention which is proved by extraneous evidence *dehors* the contract, but an intention which is to be inferred from, and is therefore embraced in or manifested by, the contract itself. No court has ever held or intimated that parol evidence was admissible to prove that the bond or note of a *feme covert* was intended to be a charge upon her estate. To permit this would be in direct conflict with the rule which excludes all parol evidence offered to explain a written instrument. The intent, to be of any importance, must be a part of the contract: that is, the true meaning of the contract when justly interpreted must be, that the debt which it creates should be a charge upon the estate. This case, therefore, is not materially strengthened on the part of the plaintiff by the finding of the judge, that the defendant intended the debt to be a charge, as that intention, if it existed,

forms no part of the note, which must be regarded as the only evidence of the contract.

But the reasoning of Lord BROUGHAM in *Murray* v. *Barlee* has been since overthrown, and the doctrine based upon it is not now the doctrine of the English courts. In the case of *Owens* v. *Dickenson* (1 Craig. & Ph., 48), Lord Chancellor COTTENHAM appears to have seen that there could be no real foundation for the assumption that because a married woman had executed a bond or note, or contracted a debt in any other form, therefore she must have intended to charge such debt upon her separate estate. He first shows, what, indeed, is very plain, that if the doctrine is sound, then every debt must become a specific lien upon the separate estate to be paid in the order of its priority: while Lord BROUGHAM held that such debts are all to be paid *pari passu*. He then argues, very conclusively, to prove that a contract which is entirely silent as to the separate estate, and makes no reference whatever to its existence, cannot by any legal reasoning be shown to have been intended as a disposition of such estate.

After thus removing the only ground upon which every English Chancellor, from Lord LOUGHBOROUGH to Lord BROUGHAM, had held a bond or note, and upon which the latter had held every other contract, to create a charge, Lord COTTENHAM proceeds to inaugurate an entirely new doctrine on the subject, which is, that equity lays hold of the separate property, and appropriates it to the payment of the debt; not on account of anything contained in the contract; not because the wife, by any agreement, either express or implied, has made the debt a charge; but for reasons which I will give in the learned Chancellor's own words: "The separate property of a married woman being a creature of equity, it follows, that if she has a power to deal with it, she has the other powers incident to property in general, namely: the power of contracting debts to be paid out of it; and inasmuch as her creditors have not the means at law of compelling payment of those debts, a court of equity *takes upon itself* to give effect to them, not as

personal liabilities, but by laying hold of the separate property, as the only means by which they can be satisfied."

This is by no means a return to the primary doctrine of the English courts on this subject. Lord THURLOW never suggested that equity had any power to take the separate property of a married woman and appropriate it to the payment of debts which she had never in any manner charged upon it. It is an attempt to support, by an entirely new process of reasoning, a course of decision which Lord COTTENHAM plainly saw could not be sustained upon any of the grounds upon which it had been previously placed.

But whether we adopt this last phase which the shifting doctrine in respect to a wife's separate estate has assumed or not, it is certain that the judgment in the present case cannot be upheld. As was shown by Judge COMSTOCK when this case was here before, mere equity, not resting upon any positive contract, will never seize upon the separate estate of the wife, and appropriate it to the payment of a debt of the husband, for which she is a mere surety: and it follows from what has been previously said, that the estate of the defendant cannot be held liable upon this note, upon the ground that she intended to make it a charge; because to make such an intent of any importance, it must be either expressed or implied in the terms of the contract.

But I am unwilling to leave it to be inferred that I assent to the doctrine of Lord COTTENHAM. It seems to me even less defensible than the theories which preceded it. Those theories conceded, that the separate estate of a *feme covert* could not be appropriated in payment of her debt, unless she voluntarily charged such debt upon her estate. Their error consisted in raising an implication of an actual appointment or charge upon wholly insufficient grounds. But Lord COTTENHAM's doctrine denies the necessity of any intentional charge of the debt at all by the wife upon her separate estate, although it at the same time makes her power to dispose of that estate the basis of its liability. His argument, when reduced to its simplest terms is, that a married woman who has a separate estate, has power

Yale *v.* Dederer.

in equity to charge any debt she may incur upon such estate; and inasmuch as the general creditors of such married woman, whose debts have not been thus charged, have no other means of collecting them, equity takes hold of the separate estate, and appropriates it to their payment.

Can this be sound? I am unable to see any logical connection between the premises and the conclusion. It may be very just, abstractly considered, that equity should thus dispose of the estate; but it is clearly impossible to deduce the doctrine from the *jus disponendi* of the wife, which is its only foundation. The truth would seem to be that this mode of dealing with the estates of married women, to the extent to which it has been carried by the English courts, could not be sustained by any process of legal reasoning, and hence the grounds upon which it was made to rest have been repeatedly changed, and the rule itself has been fluctuating and uncertain.

These views are not new. Judge STORY, in his work on Equity Jurisprudence, says: "It has been remarked, that this rule of holding that a general security, executed by a married woman, purporting only to create a personal demand, and not referring to her separate property, shall be intended as *prima facie* an appointment or charge upon her separate property, is a strong case of constructive implication by courts of equity, founded more upon a desire to do justice, than upon any satisfactory reasoning."

The courts of this State have never, as yet, adopted the doctrines of the English Court of Chancery on this subject; certainly not to their full extent: and it would in my view be inexpedient now to do so, for various reasons. If we attempt to follow a class of decisions which obviously rest upon no solid basis of principles, we can never arrive at any settled conclusion. The views of Lord COTTENHAM are no more likely to be permanent than those of his numerous predecessors. Some future Lord Chancellor may detect the fallacy of his reasoning as he detected that of Lord BROUGHAM. No rule can ever be stable, the reasons given for which are constantly changing. If we desire precision and certainty in this branch

of the laws, we must recur to the foundation of the power of a *feme covert* to charge her separate estate; and this has heretofore arisen solely from her incidental power to dispose of that estate. Starting from this point, it is plain, that no debt can be a charge which is not connected by agreement, either express or implied, with the estate. If contracted for the direct benefit of the estate itself, it would, of course, become a lien; upon a well founded presumption that the parties so intended and in analogy to the doctrine of equitable mortgages for purchase money. But no other kind of debt can, as it seems to me, be thus charged without some affirmative act of the wife evincing that intention; and there is no reason why her acts in this respect should not be tested by the same principles and rules of evidence which are applied to similar questions in other cases.

But there is a strong additional reason why this court should decline at this time to adopt the fictitious theories on this subject which have so long prevailed in the English courts. Married women are not hereafter to be indebted to equity merely for protection in the enjoyment of their separate estates. They hold them by a legal title and have a legal right to dispose of them. The acts of 1849 and 1860 are henceforth, if not repealed, to be the source of their power over such estates. There is no longer any foundation for the argument, that as equity creates and protects these estates, equity has a right to control them. Rules, therefore, which have grown up under this idea, which I regard as to some extent illusory, will be hereafter entirely inappropriate. I shall not attempt at this time to put a construction upon those acts. That of 1860 authorizes married women to carry on any trade or business upon their own account; but with this exception, the only contracts which it empowers them to make, are those which have direct reference to their separate property : and even this power, where the property consists of real estate, is subjected to a very important restriction; the consent in writing of the husband, or the authority of a court, being rendered essential to its exercise.

These provisions show that the legislature has not even now intended to remove the common law disability of married

women to bind themselves by their contracts at large. To be obligatory upon them or their estates under our latest statute, their contracts must relate entirely to their separate property, or to the particular trade or business in which they are engaged. This legislation harmonizes with the views I have advanced in regard to the effect of the contracts of married women. It lends no countenance to the idea that the mere possession of separate estates renders their contracts having no relation to such estates binding upon them. It would be impossible, as it seems to me, to hold, under our statutes, that the mere execution of a security by a married woman not connected by agreement with her estate could be a charge upon it ; and yet the power of disposal conferred by these statutes, is, to say the least, as complete as that previously possessed by married women by virtue of the *jus disponendi*, which resulted from mere ownership. There would, therefore, be a manifest incongruity in holding, in the present case, that prior to our late statutes the debt of a *feme covert* not connected with her separate estate, nor in any manner charged by contract upon it, could be enforced against it, and then deciding, as we evidently must, that under those statutes an actual charge is necessary.

The judgment of the Supreme Court should be reversed, and there should be a new trial, with costs to abide the event.

All the judges concurred; COMSTOCK, Ch. J., DENIO and BACON, Js., upon the ground that the case as now presented did not vary from that when here before. A majority concurred in the opinion that the intention to charge the separate estate must be stated in the contract itself, or the consideration must be one going to the direct benefit of the estate.

Judgment reversed, and new trial ordered.