CAROLINE B. STALEY, APPELLANT, VS. A. B. HAMILTON ET UX., APPELLEES.

1. Where money is loaned upon the urgent importunity of a wife and her husband for the use of the husband, the wife joining him in making a promissory note for the money, she being possessed of separate real property, and not giving a valid security by mortgage or otherwise on such property, equity will not charge her separate property with the indebtedness.

2. The only manner in which a married woman, living with her husband, can create a charge upon her separate property for an indebtedness not incurred on account of the beneficial nature of the consideration as enuring to the benefit of her property or estate, is by some deed, mortgage or other instrument of writing duly executed and acknowledged according to the statute.

3. A charge upon a married woman's separate property may arise in equity, where it must be necessarily inferred from the fact that the debt is contracted for the benefit of her property or estate, in analogy to the doctrine of equitable lien for purchase money, that she intended the payment to be made out of her own property, or where, living separately from her husband, the debt is contracted by her for her own personal benefit.

Appeal from the Circuit Court for Jackson county.

The respondents (May 11, 1868,) filed their bill against appellant, alleging that on May 4, 1866, the appellant and her then husband, now deceased, borrowed of Mrs. Hamilton $1,000 in gold coin, for which they (Staley and wife)

promised to pay Mrs. Hamilton on December 30th then next $1,200 in legal tender of the United States, with interest at 8 per cent. from May 4, 1866 ; Mrs. Staley paid $178.23 on August 28, 1867. At the time of making such contract Mrs. Staley was the owner of *lots 36 and 43* in Marianna, " said property being highly improved by an excellent and commodious dwelling-house and out houses, and being her separate and sole property. Mr. Staley died in April, 1867, leaving as complainants are informed and believe, no visible property upon which a judgment could rest sufficient to pay any part thereof." He, as complainants are informed and believe, at the time of making such contract, had no visible property within the knowledge of complainants upon which any faith of credit could attach. Mrs. Staley, at the time of making such contract, received *in person* from said Mrs. Hamilton the said coin. At the time of making such contract, and several times before, " she freely and voluntarily, and without any compulsion, constraint, apprehension or fear from her said husband, proposed, promised and offered to make and execute a legal and valid mortgage on said lands to said Mrs. Hamilton as collateral security for said debt, and Mr. Staley promised to join in the execution thereof, but neither of them has done so. Complainants believe and represent that Mrs. Staley will fraudulently dispose of her said property (if she has not done so) to avoid the payment of said debt.

Prayer for an injunction and that the said property be held subject to and sold for payment of said debt, and that Mrs. Staley be decreed to pay the debt."

On same day an order was made for an injunction to issue on bond of $500 being given. It issued, but no bond appears to have been given.

On April 4, 1878, Mrs. Staley demurred, and November 18, 1878, an order was made sustaining the demurrer and allowing amendment.

December 23, 1878, the complainants amended their bill by alleging that at the time of making the note Mr. S. was in embarrassed circumstances, if not hopelessly insolvent, and this was well known to complainants; and they repeatedly refused to let him have the money on his own responsibility, but eventually consented to let Mrs. S. have it, provided she would make her separate estate responsible for it, she then owning said property. Complainants did not covenant to do this till strongly importuned by Mrs. S. in person, who repeatedly promised to make her separate estate liable and give a mortgage on the lots if they would lend her the money; that at the time she and her husband executed the note they also executed a mortgage to secure the note; that through inadvertency Mrs. S. failed to relinquish her dower in the lots, but long afterwards acknowledged the justice of the debt and the liability of her property therefor, as complainants are informed and believe, and consented for a judgment to be rendered against her separate estate for the debt. The money was lent to *her*, for her separate use and benefit, and so used by her.

The joint promissory note of Mr. and Mrs. Staley, payable to Mrs. H., endorsed " collected this August 28, 1867, of Mrs. C. B. Staley and paid over to A. B. Hamilton $178, Landrum & Dawkins, attorneys for A. B. Hamilton," is attached as an exhibit, as is also a paper purporting to be a mortgage from Mr. and Mrs. S. on said property to Mrs. H. securing said note, both of which are dated May 4, 1866. There is no acknowledgment by Mrs. or Mr. S. of this paper.

December 20, 1878, defendants demurred, and May 30, 1879, the demurrer was sustained and permission to amend given.

August 6, 1880, the complainants again amended their bill as follows: That said defendant to whom complainants

lent said money owned lot and a half in Marianna—lot 36 and N. ½ of 35. She promised to give a mortgage on said lots to secure said money which they loaned the defendant on the faith of said promise. Defendant and husband gave mortgage on lots 36 and 43 instead of 35 and 36, which, complainants believe, was done through mistake, as she believes defendant and her husband were acting good in faith and intended to give the mortgage on 36 and half of 35 ; that the mortgage given was not legally executed in that the defendant was not examined before a judicial officer as to her free execution thereof.

*Prayer* for decree that lot 36 and N. ½ of 35 be subjected to the payment of said debt and general relief.

June 16, 1879, defendant demurred as of June 3, 1879 :

1st. No equity in the bill as amended.

2d. No statement how the money was applied to her individual use and benefit or so used.

3d. Allegations too general, indefinite and uncertain.

4th. No statement that the property sought to be charged and subjected is trust property, or that it is an equitable estate she has therein, or that it was a statutory separate estate.

September 6, 1880, demurrer overruled with leave to answer.

January 15, 1881, defendant answered as follows :

Mrs. Hamilton did not, on May 4, 1866, lend respondent $1000 in gold coin, or any sum of money. She was informed by her husband that Mr. or Mrs. H., on or about said day, lent him $1,000 or $1,200, how much was in gold and how much in currency she is not able to say. She never voluntarily agreed to pay $1,200 in currency or return the gold. Never agreed to pay interest. No part of any debt she ever contracted with either of them remained due or unpaid on 11th of May, 1868.

She never made any contract with either of complainants in regard to borrowing any money from either or both. On May 4th, 1866, she owned and held by deed as her sole and separate property lots 36 and 35, and owned them 28th May, 1867; has never sold; does not own lot 43. March 2, 1868, a judgment was recovered in United States Circuit Court against her by John S. Pemberton & Co. for $1,027.31, execution issued January 19, 1869, and levied on lots 35 and 36, and they were sold by United States Marshal March 1, 1869, and bid off by J. F. McClellan for $300, and she now claims no title or interest in said lots.

Her husband's name was N. O. J. Staley. May 4, 1866, he owned in his own right and visible a stock of goods, wares and merchandise in Marianna worth from $3,000 to $4,000, a horse and buggy, and wagon and mules, and money, debts due him.

Denies that she received from the hands of Mrs. H. the $1,000 gold coin. Did not voluntarily or involuntarily agree to give her a mortgage on any property of hers to secure it, or the consideration thereof, or on any other account. Never voluntarily agreed to pay $1,200 in greenbacks therefor, with 8 per cent. interest from date of any contract, for she made none with Mr. or Mrs. H.

Never made any contract with either of them in regard to the loan of any money. Never proposed to mortgage her property to either of them to secure the payment of any sum of money whatever. Did not voluntarily sign the note or mortgage referred to, and is advised she did not execute the note or mortgage according to law.

*Further answering:* She denies positively having borrowed the or any money from Mrs. or Mr. H. She is informed and believes, and was informed by her husband, that he borrowed it; and she does not know anything of his negotiations to procure the loan. Her husband requested

her to sign the note and mortgage. She refused to do so; he importuned her, and after great importuning she signed both, but not either of them freely or voluntarily, or free from the restraint and power of her husband; but in doing so she acted under duress and fear of him, and she positively refused to submit to a privy examination before a judicial officer, and none was ever made.

Proceedings to foreclose begun in 1867 in Jackson County Court, resulting in dismissal May 11, 1868, are set up in bar.

She says her signature was procured through fear and involuntarily, and was a *feme covert* at the time. *Lots 35 and 36*, her sole and separate property for years, and her interest not dower but absolute. Denies having acknowledged the justice of debt or liability of her property therefor, or consented to the entry of a judgment against her separate estate for it. Denies that any sum was loaned her for her own individual use or benefit, or that it was so used or applied by her. She is informed and believes her husband employed the money in merchandise. She did not have a dollar of it for her own use, nor was a dollar expended on her separate property. It was not her debt, nor contracted by her or for her. Note and mortgage procured against her consent, and she has never assented to the same, and it is not her debt.

Is informed and believes, the endorsement on note: "Collected this August 28, 1867, of Mrs. C. B. Staley, and paid over to A. B. Hamilton, $178, Landrum & Dawkins, attorneys for A. B. Hamilton," was the balance of an account her late husband had against said A. B. H. She positively denies paying that or any other sum on the note.

Denies all other allegations going to charge her with borrowing any money from either of complainants, or that the same was applied to her use or benefit of her separate es-

tate, or that she voluntarily ever agreed or promised to pay or cause the same to be paid, or bind her separate estate for the same.

She is informed and believes the note and mortgage are in the hand-writing of the late Wm. E. Anderson; never employed him or other attorney to draw up the papers. They were brought to her already drawn up and signed by her husband, the first she saw of them. Her husband had spoken to her to sign them, but she most positively refused to do so after much importunity on his part. Signed them mechanically without her will. Consenting to the act of her hand, and without any consideration passing from Mrs. H. to her, but under duress from her husband. No part of the money was expended on her property, or for her use or benefit. Never had any property in Lot No. 43. No recollection that note or mortgage was read to her before she signed. Never considered them binding on her or her property.

For answer (filed January 15, 1881,) to amendment of August 6, 1880, she says: Complainants never lent her any money; she never presumed to give a mortgage on said lots to complainants to secure payment of any money ; denies borrowing any money from complainants or promising to pledge or charge her property ; did not give a mortgage; none was read to her, nor did she have one drawn; she refused to be privily examined or assent thereto, or to mortgage the lots or any part *thereof;* never signed the papers freely and voluntarily, and did not intend to mortgage said lots, or in any way make them liable to the debts of her husband.

The answers are sworn to. Replication was filed January 4, 1880.

Testimony—D. C. Dawkins for complainants says:

The papers were placed in his hands by Mr. H. for collec-

tion, he being an attorney at law then (May, 1868,) living at Marianna, and he conversed with defendant twice as to them. She said the $1,200 was borrowed for the purpose of starting her husband in mercantile business after the war at Marianna; that it was through her instrumentality the money was obtained. Before the papers were put in his hands he visited Mrs. S. and stated that Mrs. H. wished him to take charge of the case, but that witness would not do so if she wished his services. She said the $1,200 was obtained through her instrumentality and was a just debt, wished no defence made, and had no objection to my taking the case against her. Soon the note and mortgage were put in his hands, and he visited Mrs. S. with them and pointed out wherein he thought she had a defence and offered his services, and she repeated that she had no defence to make and was willing I should represent Mr. H. She never paid me any money on the debt at any time. Landrum & Dawkins filed the bill. Witness not complainants' attorney now. Does not remember whether there was any privy examination or whether he was a subscribing witness, or there was any. Conversations with Mrs. S. were a short time prior to the commencement of the suit and at her home; no other person present; made no memorandum of them; had been legal counsel of her then recently deceased husband; her husband and myself were Masons; families friendly and intimate; my relations not confidential, merely friendly. Does not remember the defects pointed out. Was not undertaking to advise her. Told her he would represent her if she wanted any defence made, even if it was to gain time. The credit on the note, to the best of his recollection, was placed there by consent of parties as a settlement of a store account of Mr. S. against Mr. H. Nothing paid to witness or Landrum and himself on said note so far as he knows. Defendant did not act

under his advice ; made known to her whatever defence he could see, but she persistently said that she would not cheat her cousin, Mrs. H., out of the $1,200 in gold which she had borrowed from her if she could ; did not dismiss the suit. Mrs. S. never acted under my counsel or advice.

Mrs. Hamilton testified as follows :

The consideration of the note and mortgage was money loaned defendant and her husband. It was gold. *They* borrowed the money. They both said they had money in boats on the river, and had the house and lots, and the money would be paid in a short time. It was loaned at the urgent request of both. It is impossible at this day to recollect all that occurred at the numerous interviews had in reference to the matter, except that it was constantly urged by both that they should have the money. She had no conversation with defendant soon after death of her husband on the subject (*i. e.*, one-half of the money and her saying she would let the house and lot go if she could not raise the money). Defendant made no payment to me after her husband's death. Wm. E. Anderson was a witness. Do not recollect any other papers signed in witness' presence at Mr. Staley's house. Parties named were present (Mr. and Mrs. H., and Mr. and Mrs. S., and W. E. Anderson are the parties named in the answer). More letters passed (as touching loan) than words. Much of the negotiations was by letters. Impossible to remember what occurred at the interviews personally held. As to the payment on the note she says she had no conversation, nor did she secure anything in payment from defendant.

Mr. Hamilton testified as follows :

Consideration, $1,000 in gold paid *into the hands of Mrs. Staley.* Defendant said she would secure the payment of the note by giving a mortgage on the house and lot they

occupied. Money was loaned by special request of Mrs.
Staley. While urging the loan they said they held an in-
terest in steamboats on the Chattahoochee river, and they
would have the money soon. This assurance was made at
frequent interviews. Had a conversation with defendant
soon after Mr. S.'s death. She said she did not have the
money at that time; thought she would have it soon. If
she did not raise it was willing that the mortgage be fore-
closed, and had no defence to make against foreclosing it.
Told her I should take steps to foreclose, and went imme-
diately to consult D. C. Dawkins, who said he would not
take the case before seeing her, as he was her adviser in the
management of her husband's affairs. Dawkins consulted
her, and in a few hours told me he would take the case as
she had no defence to make, and I then placed the note
and mortgage in his hands for collection. Since Mr. S.'s
death I have received something over $170, more or less,
from defendant as a payment on the note, &c. Papers
signed at Mrs. S.'s house. Anderson was a witness. He
and Mr. and Mrs. Staley and my wife and self present were
*witnesses* to the mortgage. Not less than six interviews in
spring of 1866 before the money was borrowed. Mr. and
Mrs. S. present at most of them, and other parties not rec-
ollected. Once N. O. J. Staley not present. Mrs. S. and
her son came to my house to get the money. Mr. Staley
said at interviews that he and his wife had an interest in a
steamboat, and they could easily sell this and get the money
to pay back. Had only a conversation with defendant soon
after Mr. S.'s death. The $170 credit was not the balance
against myself or wife, but was paid to me in U. S. cur-
rency. I do not recollect giving a receipt to defendant.

Testimony of Mrs. Staley:

Mr. Staley died April 11, 1867; was a merchant. I Did
not borrow money at any time. My husband borrowed it

of one of the complainants, Mrs. Hamilton. Told me the money was loaned, and claimed it as belonging to her. The note was signed by me at the suggestion of my husband simply to accomplish what he requested of me. As to the payment she says : Mr. H. was in debt to my husband on store account. Dawkins and H. came to my house, and D. asked for the books of my husband, and after ascertaining the amount due by Hamilton to my husband D. credited the note with the amount due. Dawkins made the endorsement of the credit. I paid no money to L. & D., or either of them. On May 4, 1866, she signed the mortgage on lots 36 and 43 to secure the payment of the note. Did so at the request of her husband simply with a view of forwarding the intent of her husband. Was not privily examined by a judicial officer. No application made to her for that purpose. Owned lots 35 and 36 May 4,1866,and now in possession by deeds from Mrs. B. A. Chapman and Mrs. M. H. Roulhac. Conveyance from Roulhac to defendant of north part of lot 35, October 11, 1858, and conveyance from Chapman to defendant of 110 feet on Jackson street off the north end of lots 36 and 43. Had conversation with Dawkins as to note and mortgage. He was desirous of defending the case for me, pointing out a line of defence, but I was advised not to employ him. Has no recollection of conversation stated by Dawkins in which she said the money was borrowed by her instrumentality, &c. Witness had a defence to make to the foreclosure, but not through Mr. D. ; had taken another channel by which her defence would be known. The suit instituted by L. & D. was dismissed, they leaving the county. Said to Dawkins that if (Mrs. Staley) could collect the debts due her husband's estate she would pay the debt. Has no recollection of using the " cheat her cousin," &c., language. D. merely an acquaintance and neighbor. Never made a pay-

ment of $157, more or less, on the note ; made no payment to Mr. and Mrs. H. except that stated in the balance of account credited.

Witness on cross-examination says :

Was not forced to sign the note or mortgage ; was reluctant to do it for reasons operating on a cautious and prudent wife ; Mr. S. was never unkind to me ; was kind and considerate, and we often had conversations about our own affairs and interests, in which witness deferred to her husband. If any urging or force was used to procure the signatures to the paper, it did not occur before others.

On March 1, 1882, Judge Maxwell rendered a decree directing the sale of lot 36 and the north half of lot 35 to pay $2,478.18, the principal and interest on said note.

March 22 the defendants appealed.

*Geo. P. Raney* for Appellant.

The court erred in overruling the last demurrer. This demurrer was overruled by order of *September 6th, 1880*, on which day it came on to be heard, and as we take it, it was treated as a demurrer to the bill as it then stood amended.

The bill, as amended, does not show whether the property proposed to be subjected to the payment of the debt was the appellant's " equitable separate estate " or her statutory " separate property." If it be an estate of the former kind, it should set forth the instrument creating it or the nature and incidents of the estate, and show the power to create the charge. Dollner, Potter & Co. vs. Snow *et als.*, 16 Fla., 91–3.

The original bill speaks of lots 36 and 43 being " her separate and sole property." The first amendment speaks of her making " her separate estate " responsible for " the money," she then owning said property.

Moreover, if it is her separate equitable estate there is a

trustee, and such trustee is a necessary party, " an indispensable party." Ibid, 93.

II. The decree of March the 1st, 1882, is erroneous, even laying aside all errors of description of the property in the pretended mortgage.

In the first place, the promissory note as such is a nullity, and does not of itself bind her or property. Ibid.; Hodges vs. Price, 18 Fla., 342.

The mortgage also is in law a nullity as such, having no separate acknowledgment of the wife as required by the statute. T. Digest, pp. 221, 179; Barrett vs. Teukeberry, 9 Cal., 13 ; Wooden vs. Morris, 2 Green, 65 ; Lane vs. Dolick, 6 McLean, 200.

The separate acknowledgment was to protect the wife against the influence of her husband. Whatever its purpose its absence renders the instrument a nullity as a statutory mortgage of the wife's property in a case where the terms of the grant to her, or to a trustee for her, do not give her clear power to mortgage without it.

Such being the case, we further contend that to sustain the decree it must be shown that the debt was contracted for the benefit of the separate property or separate estate, or for at least her benefit on the credit of it.

A married woman has no power to charge her separate estate by any writing, even though it contain words which show a clear intention to bind such estate, except a mortgage acknowledged as required by law, or for debts contracted for the benefit of her separate estate, or for her own benefit on the credit of it. Perkins vs. Elliot and Wife, 7 C. E. Green, 127 ; 8 C. E. Green, 526, 34, 5 ; Barrett vs. Teukeberry, 9 Cal., 13 ; Pond vs. Carpenter, 12 Minn., 430.

The words " the said obligation to be charged upon the separate estate of said Louisa Elliott," in a note signed by a married woman as security for her husband, do not create a lien on her separate estate. Ibid.

There is no pretence that the debt was contracted for the benefit of the separate property.

It is, however, alleged in the bill that it was lent to appellant for her separate use and benefit, and so used by her; and that the loan was induced by a promise of a mortgage on the property, and made on the faith thereof. There is an entire failure to prove the allegations as to lending it to appellant for her separate use and benefit, or that it was so used. In her answer, which is responsive to both the allegations and interrogatories of the bill, she denies that she borrowed the money, or "that it was lent to her, but says her husband informed her it was lent to him; and denies that she received it from the hands of Mrs. H. She further denies that it was loaned to her for her own individual use or benefit, or so used or applied by her; but is informed and believes her husband employed it in merchandise. She says, moreover, she had not a dollar of it for her own use, nor was a dollar expended on her separate property. There is nothing in the evidence of either Mr. or Mrs. Hamilton to the contrary of the statements of the answer as to its being lent or borrowed for her use, or so used. In fact, there is a strange absence from the testimony of any proof of the purposes and use of the loan. Dawkins says the appellant said in one of her conversations with him that it was borrowed for the purpose of starting Mr. Staley in business.

The burden is upon the complainants to show any and all facts to make appellant liable. Tracey vs. Keith, 11 Allen, 214; Hodges vs. Price also illustrates the doctrine.

Not only does the testimony fail to show that the money was lent or borrowed for her benefit, or so used, but it has features that indicate the contrary besides the statement of Mrs. Staley as to mercantile business. Mrs. Hamilton says it was loaned both to Mr. and Mrs. S. at the urgent request of both. She was urged by both that they should have the

money. They both said they had money in boats on the Chattahoochee river and the house and lots. Mr. Hamilton says : " While urging the loan they said they held an interest in steamboats on the Chattahoochee river, and that they would have the money soon. This assurance they made at frequent interviews." In the first amendment to the bill it is stated that they frequently refused to let Mr. S. have the money on his own responsibility, but would agree to let Mrs. S. have it provided she would make her separate estate responsible for it. The testimony just stated is inconsistent with the quotation from the bill in so far as not letting him have it, as the former states, (as does the bill in other places,) that they both borrowed it. Now, if Mr. S. had been trying to get it before is not the legal presumption that he wished it for himself, and that she came in to aid him in getting it, and they got it for him? Mrs. Staley, moreover, says Mrs Hamilton told her the money was loaned. She signed the note at the suggestion of her husband, simply to accomplish what he requested and to forward his interests.

Only one witness (Mr. H.) testifies to the allegations of the bill that the money was paid to Mrs. S. This is not sufficient to overcome her denial.

Mr. Hamilton is not sustained by any one as to Mrs. Staley having ever made any payment on the note. Mrs. Staley is sustained in her explanation of the credit by Dawkins' recollection.

The fact that it was through her instrumentality that the money was obtained (if such be a fact) does not establish that it was borrowed for her benefit. In Yale vs. Dederer, 68 N. Y., 334, it is said : " The plaintiff sold the property doubtless upon the credit of the defendant and of her estate, but this might be equally true whether she was principal or surety, and the same might be said of any other person pro-

posed as surety." Manhattan H. & B. Co. vs. Thompson, 58 N. Y., 80.

I believe that the only legitimate conclusion to be drawn from the record is that it was not borrowed for the benefit of Mrs. S., or so used, but for the benefit of her husband.

There is nothing, then, in the nature or " *res gestœ* " of the contract through which a court of equity can make the debt a charge on the property.

In the case of Yale vs. Dederer, 22 N. Y., 459, it is said: " No rule can ever be stable, the reasons given for which are constantly changing. If we desire precision and certainty in this branch of the laws, we must recur to the foundation of the *power* of a *feme covert* to charge her separate estate, and this has *heretofore arisen solely from her incidental power to dispose of that estate.* Starting from this point it is plain that no debt can be a charge which is not connected by agreement, either express or implied, with the estate. If contracted for the direct benefit of the estate itself, it would of course become a lien upon a well founded presumption that the parties so intended and in analogy to the doctrine of equitable mortgages for purchase money ; but no other kind of debt can, as it seems to me, be thus charged without some affirmative act of the wife evincing that intention, and there is no reason why her acts in this respect should not be tested by the same principles and rules of evidence which are applied to similar questions in other cases."

This language is approvingly quoted by this court in the case of Blumer & Blumer vs. Pollak. If the power to charge is referable to the *jus disponendi*, then in the absence of a benefit resulting to or intended for the property from the loan, and I may say also in the absence of a contract beneficial to the *feme covert* and based on the credit of the separate estate, where is the power, whatever the intent

may be, in this State to make a charge on real estate without the separate acknowledgment? It is a limitation upon the *jus disponendi* in all cases where there is not something inherent in the " *res gestæ* " of the contract by which equity will impose the charge.

In New York and Massachusetts, with statutes giving the wife power to convey separate and independent of her husband, it is held that the instrument itself must show the intention to charge the property in cases where there are no inherent circumstances creating the charge. In Florida, we believe, that in all such cases not only should the instrument show the intention, but that it should be such an instrument as the statute has prescribed for such cases. Such is the rule laid down in the case of Perkins vs. Elliott. See also 1st Leading Cases in Equity, (Hulme vs. Tenant,) Vol. 1, p. 752, reading to end of 1st paragraph on p. 754; Ibid ., 754, from last par. therein to end of 2d par. on p. 756; Ibid., 759 to 760, 764-5 ; American Ins. Co. vs. Avery, 60 Ind., 571.

As to lot 35, which is not mentioned in the pretended mortgage, we submit that there is, upon the authority of Yale vs. Dederer, no intent to mortgage or charge this lot legally shown; and upon the authority of Barrett vs. Tewkeberry and Wooden vs. Morris, that the intention could not now be enforced, and that the claim of the complainants to charge it is also not valid for the reasons set forth in the preceding pages.

*D. L. McKinnon* for Appellees.

The question involved in this case has been so elaborately reviewed recently by this court that I do not deem it necessary to do more than make a few citations, to sustain the position of the appellees.

The modern rule both in England and America being

that where the facts and circumstances connected with the transactions clearly indicate the intention of a *feme covert* to bind her separate estate they will give effect to that intention; of course this intent must arise from her free volition, and proof of the intent at the time of contracting the debt must not be doubtful. Though courts hold that the very fact of the wife joining with the husband as surety is *prima facie* evidence of intent to bind her separate estate, as her name to the note could be of no other benefit. The free volition in doing the act and intention at the time are of the controlling facts which govern courts in determining the liabilities of the wife's property for debts contracted by her or jointly with her husband. 2 Story's Equity, marginal page, from 625 to 628 ; Notes 1, 2 and 3, p. 424, Hill on Trusts.

There is nothing in any of the decisions of this court which I conceive is in conflict with this doctrine. The tendency of modern decisions is in all cases to give effect to the true intent and meaning of the contracting parties when there is no positive law to forbid it. Any other doctrine would be inequitable and unconscionable, and open wide the door to fraud and enable parties to take advantage of their own wrong. An idea obnoxious to justice, repulsive to equity and antagonistic to morality.

The only question of fact to determine is, did the appellant intend to subject her separate property to the payment of the debt, it being alleged in the amended bill that the lots were her separate property, which is admitted in the answer; besides the deeds filed in evidence show it?

While her answer is very positive in denying her free will in executing the note and mortgage, yet when she comes to testify in response to interrogatories she absolutely contradicts her answer, and admits that she was not forced to sign the note and mortgage, but did so to get money to start her husband in business.

Every material allegation of the bill is amply sustained by the testimony of both complainants and D. C. Dawkins, a disinterested witness. This evidence shows that she executed the mortgage freely and voluntarily, from her acknowledgments. before and after the death of her husband, and even up to the institution of this suit. The fact that she intended to bind her separate property for the debt is too abundantly proven by the testimony of three witnesses to admit of even the possibility of a doubt. The sole suggestion in this case is, to determine whether a *feme covert can*, if she desires, with the consent of her husband, bind her separate estate as surety for him. That is the question for the court to determine, and this court has never before determined this question thus presented.

If the wife cannot bind her separate estate the husband cannot. And if they both together cannot bind it it is burden and infliction upon them rather than an advantage. Both might starve for the necessaries of life, while the wife was worth her thousands. Most assuredly the law to protect the wife's property against the debts of the husband did not contemplate any such absurdity. The true spirit and reason of what is familiarly known as the "married woman's law" was only to protect her separate estate from her husband's debts, contracted against her consent. But it never was intended to enable either the wife or husband to perpetrate frauds upon third parties. And a more palpable fraud never was perpetrated than this would be if the appellants' property is not subject to the debt. For the complainants positively swear that they would not have loaned the money if it had not been that she promised to secure it with her separate property, and refused to take her husband's individual responsibility.

Courts of equity frown upon fraud and every species of bad faith, under any and all circumstances. Its evil influ-

ence is demoralizing to the administration of justice. And they will never lend their aid to consummate or protect a dishonest evasion of a law, because parties are within the letter, but not within the spirit and reason of the law.

THE CHIEF-JUSTICE delivered the opinion of the court.

The bill with its amendments, the answer and the proofs show that Caroline B. Staley and her husband, N. O. J. Staley, (who is not now living) executed a promissory note to Narcissa W. Hamilton, the wife of A. B. Hamilton, whereby they promised to pay Mrs. Hamilton twelve hundred dollars with interest. The consideration of this note was one thousand dollars in gold coin, and the date of the transaction May 4, 1866. The money was borrowed for the use of N. O. J. Staley in his business, and was loaned by Mrs. Hamilton upon the importunity of Staley and his wife, they agreeing to secure its payment by giving a mortgage upon two lots, the separate property of the wife in Marianna. A mortgage was drawn up in due form and signed by Staley and his wife (appellant) and proved for record by a subscribing witness, but was never duly acknowledged as required by the statute, and therefore was not operative as against the wife or her property. Mrs. Staley says she did not intend to acknowledge it if she had been asked to do so.

The bill is filed for the purpose of subjecting the separate property of Mrs. Staley to the payment of the money borrowed under the circumstances stated. The Chancellor decreed in favor of the complainants (appellees), and held that " the defendant signed said note with her husband for the purpose of subjecting her separate *estate* " to the payment of the note, and directed the sale of the lots described to satisfy the indebtedness.

The statute authorizes a married woman owning real es-

tate of inheritance to sell, convey and mortgage the same in the same manner as she might do if she were sole and unmarried ; *Provided*, Her husband join in such conveyance or mortgage and the same be authenticated as prescribed by laws regulating conveyances; and *provided*, also, she acknowledge, separate and apart from her husband, that she executed the same freely and without any fear or compulsion of her husband. (Acts February 4, 1835, and March 6, 1845, McClellan's Digest, 755, §§6, 9.) According to these statutes a married woman can create a legal charge upon her separate property only by the means so designated. Peake vs. LaBaw, 6 C. E. Green, N. J. (Eq.,) 269, 282.

The English equity rule is that if a married woman enters into a general contract to pay money the inference is that she means to pay it, and if she has a separate estate it will be inferred that she intended to charge such estate with it. An equitable estate is referred to.

Lord Brougham in Murray vs. Barlee, 3 Mylne & K., 209, 223, says : "In all these cases I take the foundation of the doctrine to be this : the wife has a separate estate subject to her own control and exempt from all other interference or authority. If she cannot affect it no one can, and the very object of the settlement which vests it in her exclusively is to enable her to deal with it as if she were discovert. The power to affect it being unquestionable, the only doubt that can arise is whether or not she has validly encumbered it. At first the court seems to have supposed that nothing could touch it but some real charge, as a mortgage or an instrument amounting to an execution of a power, where that view was supported by the nature of the settlement. But afterwards it was more regarded, and the court only required to be satisfied that she intended to deal with her separate property." And see Story's Eq. Jur., 11 Ed., §1401, *et seq.*

But the rule prevailing in this country in regard to the separate statutory property of married women is different from the equity rule in respect to a married woman's separate *estate* which is properly an equitable estate and not her legal property—an estate vested in a trustee for her benefit, over the body of which she has no legal power of alienation except such as might be given by the terms of the grant or settlement creating it. Dollner, Potter & Co. vs. Snow, 16 Fla., 86.

In the case of the separate statutory property, especially under our statutes regulating alienation, the equitable rule cannot prevail, and it cannot be inferred that a married woman intends to alienate her property, except by the prescribed method, when the contract is not for the benefit of herself or her separate property, for the law will not permit her to do indirectly what it forbids her to do directly. In the case of Perkins vs. Elliott and Wife, 7 C. E. Green, 127, a married woman had signed a note with her husband as his surety, not for her own benefit or for that of her separate property, and the note contained these words: "The said obligation to be charged upon the separate estate of said Louisa Elliott," and the court says that "it is not within the power of a married woman to charge her estate by any writing except a mortgage acknowledged as required by law, or for debts contracted for the benefit of her separate estate, or for her own benefit on the credit of it." This doctrine was affirmed in the same case on appeal in 8 C. E. Green.

In Johnson vs. Cummins, 1 C. E. Green, 97, 104, the Chancellor says: "The general principle is that a married woman is enabled in equity to contract debts in regard to her separate estate, and that the estate will be subject in equity to the payment of such debts. In order to bind the separate estate it must appear that the engagement was *made*

*in reference to* and upon the faith and credit of the estate. But where a married woman, living apart from her husband and having a separate estate, contracts debts, the court will impute to her the intention of dealing with her separate estate, unless the contrary is shown."

In Peake vs. LaBaw, 6 C. E. Green before cited, the Chancellor says: " The courts of this country have declared the estates of married women, held under the married women's acts, to be liable for debts contracted by them for the the benefit of their separate estates, or for their own benefit on the credit of these estates. But they go no further than this."

The Court of Appeals of New York in Yale vs. Dederer, 22 N. Y., 450, held, upon the question whether the mere signing a note as surety for her husband, with parol proof that credit was given to her separate estate, would amount to an equitable charge, that it would not. " No court has ever held or intimated that *parol* evidence was admissible to prove that the bond or note of a *feme covert* was intended to be a charge upon her estate." " If investing her with separate property," says Chancellor Kent in The Meth. E. Church vs. Jaques, 3 Johns. Ch., 77, " gives her the capacity of a *feme sole*, it is only when she is directly dealing with that very property."

We refer to Dollner, Potter & Co. vs. Snow, 16 Fla., 86 ; Merritt vs. Jenkins, 17 Fla., 593, 597 ; Fairchild vs. House, 18 Fla., 770; Mattair and Wife vs. Card, Admr., 18 Fla., 761 ; Blumer and Wife vs. Pollok *et al.*, 18 Fla., 707, and Thrasher vs. Doig, 18 Fla., 809, where the effect of a contract by a married women upon her separate property is considered.

The doctrine laid down in New York, New Jersey and in a majority of the States at the present time is that the intention to charge the separate property will not be in-

ferred from the mere fact of the execution of a bond or note, nor unless it is expressed in terms in the contract, or results from the beneficial nature of the consideration as enuring directly to her benefit or the benefit of her property.

In the case of Yale vs. Dederer, 22 N. Y., 450, 459, the Court of Appeals say: "If we desire precision and certainty in this branch of the law we must recur to the foundation of the power of a *feme covert* to charge her separate estate, and this has heretofore arisen solely from her incidental power to dispose of that estate. Starting from this point it is plain that no debt can be a charge which is not connected by agreement, either express or implied, with the estate. If contracted for the direct benefit of the estate itself, it would, of course, become a lien; upon the well founded presumption that the parties so intended and in analogy to the doctrine of equitable liens for purchase money; but no other kind of debt can be thus charged without some affirmative act of the wife evincing that intention. * * But there is a strong additional reason why this court should decline at this time to adopt the fictitious theories on this subject which have so long prevailed in the English courts. Married women are not hereafter to be indebted to equity merely for protection in the enjoyment of their separate estates. They hold them by a legal title, and have a legal right to dispose of them. * * The provisions [of the acts of the Legislature on the subject] show that the Legislature has not even now intended to remove the common law disability of married women to bind themselves by their contracts at large."

In the language of the court in Willard vs. Eastman, 15 Gray, 328, 335, " where she is a mere surety or makes the contract for the acco mmodation of another without consideration receiv ed by her, the contract being void at law, equity will not enforce it against her estate unless an ex-

press instrument makes a charge upon it." And see opinion of the court in Manhattan B. & M. Co. vs. Thompson, 58 N. Y., 80, by Church, C. J.

There are exceptional cases, as where a married woman living separate from her husband, or is doing business on her own account, gets credit on account of such business or on account of her separate property, a Court of Equity may charge such property. Blumer & Wife vs. Pollak, 18 Fla. And see Burch vs. Breckenridge, 16 B. Monroe, 482.

The present case being one where it clearly appears that the wife became security for her husband for money borrowed for his use by merely signing a promissory note with him, and no valid instrument having been executed by her charging her separate property with the payment, there is no ground for holding that she did so charge it, notwithstanding the money was loaned at the earnest solicitation of both husband and wife. The statute has provided, as we have seen, that the wife, by deed or mortgage duly executed and acknowledged, may convey her separate real property, her husband joining therein, for any consideration whatever, and so she may secure the payment of any debt of her husband or herself. A deed or mortgage not so executed and acknowledged by her, covering her separate property is of no effect because this is the only method prescribed by law for so conveying or charging it; and a Court of Equity cannot enlarge the statute.

The paper signed by Mrs. Staley and her husband, in the form of a mortgage, not having been duly acknowledged, is of no validity, but is void in law and in equity under the laws of this State. Hartley vs. Ferrell, 9 Fla., 374.

Decree reversed.