## Matthews *v.* Murchison and others.

*(Circuit Court, E. D. North Carolina. June Term, 1883.)*

1. MARRIED WOMEN—ESTOPPEL—CONTRACT.
   A married woman may be bound by an estoppel, even where she has no power to bind herself by a contract, but a married woman, who is under a disability to contract, cannot be estopped by anything in the nature of a contract. To estop a married woman from alleging a claim to land, there must be some pos-

1 Reported by J. W. Hinsdale, Esq., of the Raleigh, North Carolina, bar.

itive act of fraud, or something done upon which a person dealing with her, in a matter affecting her rights, might reasonably rely, and upon which he did rely, and was injured.

2. SAME—ACQUIESCENCE.

Acquiescence or assent is tantamount to an agreement or implied contract, and requires for its validity the power to contract; and where a married woman could not make a valid contract in regard to her property, acquiescence cannot affect her rights therein.

3. SAME—DISPOSITION OF PROPERTY—HUSBAND'S CONSENT.

In North Carolina a married woman's disability to dispose of her property without her husband's written consent, extends to indirectly disposing of it by binding it by her contract.

4. SAME—MANAGEMENT OF PROPERTY—COSTS.

But a married woman may manage and control her property under the laws of North Carolina without making her husband her bailiff, and may, in doing so, incur and render her separate estate liable to such charges as are proper to its management, and may sue by herself with respect to her separate estate, and control such suit, or enter into a valid compromise or settlement of her claim therein involved.

5. CONTRACT—ABILITY OF PARTY—FORM OF CONTRACT—WHAT LAW GOVERNS.

The ability of a party to contract depends upon the law of the domicile, when the question is one of personal ability or disability; as to the form of entering into the contract, the law of the place where the contract is made must control.

6. MARRIED WOMEN—CONTRACT—LAW OF NEW YORK.

In New York there is no statute requiring the written consent of the husband to contracts to charge the wife's separate property, and a married woman can bind her separate property either by making a contract for its benefit, or by expressly charging it in the contract.

7. STOCK—OWNERSHIP BY ANOTHER CORPORATION—LAW OF NORTH CAROLINA.

In North Carolina, by statute, any railroad company within the state may own and vote upon stock in any other railroad company in the state.

8. REPEAL—QUESTION OF INTENTION.

Whether a statute has been repealed is a question of intention. Where a legislature held a summer session, adjourned *sine die*, and the same legislature was convened again in the winter of the same year, the laws of the two sessions being published in separate volumes, and always referred to as acts of different sessions, it is clear that, by an act of the next legislature repealing all acts of the "last session" upon a certain subject, there is no intention to repeal any act of the first session, (known as the summer session.)

9. EQUITY—REMOVAL OF TRUSTEES.

To justify the removal of trustees for a breach of duty, their acts must be such as to endanger the trust property, or to show a want of honesty, or capacity; and where the failure in duty, as the evidence would seem to show in this case, has proceeded from a misunderstanding, the court will refuse to discharge them.

10. EVIDENCE REVIEWED—AGENCY NOT SHOWN—PRAYER REFUSED.

As the preponderance of testimony is very strong against the claim made by plaintiff that she is the owner of the railroad bonds, either in law or equity, the prayer of the bill that the holders of such bonds be declared trustees, as having purchased the same as her agents, is denied

In Equity.

*John F. Dillon, McRae & Strange,* and *Russell & Ricaud,* for complainant.

*E. Randolph Robinson, George Davis, Merriman & Fuller, Edward Patterson, D. J. Devane,* and *Stedman & Lattimer,* for defendants.

SEYMOUR, J. This action was commenced in the month of Febru-

ary, 1882, in the superior court of New Hanover for the state of North Carolina, and was in July, 1882, on plaintiff's petition, removed to this court.

It is sought to declare void the present organization of the Carolina Central *Railroad* Company; to have the second and third mortgage bonds of the company canceled; and to enforce and carry into effect, by specific execution, a plan of organization which plaintiff claims to have been adopted by the first-mortgage bondholders of the Carolina Central *Railway* Company on the eighteenth day of May, 1880. It also seeks the removal of the trustees who now hold the stock of the new company, and the appointment of new trustees and of a receiver. It further claims, as against the defendant Murchison and the defendant corporation, the Seaboard & Roanoke Railroad Company, that they be declared trustees for the plaintiff of 615 of the second-mortgage bonds of the new company, with stock annexed. This claim is made upon the condition that these bonds were purchased by Murchison as plaintiff's agent, and by him sold to the defendant corporation, with notice. It is an alternative claim, set up as a right only in case the court shall refuse to annul the present organization of the Carolina Central Railroad Company. The plaintiff is a married woman, domiciled in the state of New York.

We merely notice the fact that the bill is multifarious, in that it seeks inconsistent remedies, and is founded upon two conflicting theories. The parties appear to have desired to settle both in one action, and as no real difficulty has arisen, the court will not of its own motion make one.

The Carolina Central Railway Company, a corporation existing under the laws of North Carolina, owned in the spring of 1880 a continuous line of railroad from Wilmington to Shelby, a town in North Carolina, some 60 miles west of Charlotte. Its property was subject to two mortgages, upon both of which it was in default. An action was pending in the superior court of New Hanover county for the foreclosure of the first of these mortgages, and receivers appointed in said action were in possession of the road.

On the fifteenth of March a decree was rendered ordering a sale. At this date the plaintiff was owner of 1,194 of the 3,000 first mortgage bonds, and 2,550, or about nine-tenths, of the second mortgage bonds, of the company, each of the par value of $1,000.

The plaintiff had owned more than a majority of the first-mortgage bonds, but had, in December, 1879, sold 500 of these bonds to R. A. Lancaster & Co.

She had, at the same time and as a part of the same transaction, hypothecated 500 more of her bonds to F. O. French "and associates" for $175,000, and had given to French and Andrew V. Stout and Arthur B. Graves a power of attorney, embracing the 500 bonds hypothecated, and 500 other bonds.

The power constituted them her attorneys to represent her with

respect to one 1,000 first-mortgage bonds of the company, and was declared to be irrevocable for five years.

It was made, however, upon this condition: "That the said French and associates shall severally consent to and approve the plan of reorganization of said railway, on the basis named in the schedule hereto annexed and marked 'A.'"

This agreement left the plaintiff the ownership of 1,194 bonds, subject to the power of attorney, embracing 1,000 of them. By virtue of their purchase and power of attorney, French and his associates controlled one-half of the bonds upon which the foreclosure suit was pending, subject to the condition of the power of attorney.

The plaintiff's endeavors were, of course, directed to the protection, in so far as she could protect them of her seconds. But it seems that it was impossible to obtain the consent of the first-mortgage bondholders to plan, Schedule A. All interests in the road were suffering under the disorganization and the receivership. In February, 1880, Mrs. Matthews consented to a second proposed plan of reorganization. This plan is also marked "A," p. 68. (The bound volume, containing the pleadings and affidavits on the motion for a receiver, is referred to, as it will be hereafter, by its red-ink paging, which runs continuously through the book.) Plaintiff's consent is evidenced by Exhibit E, p. 71. This plan failed to be acceptable, and on the fifteenth of May, 1880, Mrs. Matthews signed a paper, (Exhibit B, p 62,) whereby she agreed that Francis O. French might designate a new plan for the reorganization of the road.

In the mean while, and on the twelfth of May, an agreement was signed by the owners of $2,717,959 in value of the first-mortgage bonds, including, of course, the plaintiff. This is marked "Exhibit A," p. 57, and has been called in the argument "the bondholders' agreement." It provided for a purchase and reorganization of the road, and appointed Francis O. French, David R. Murchison, Arthur B. Graves, and James L. Wheedbee, with power to add a fifth, (and A. V. Stout was shortly after chosen by them as the fifth,) "a committee to represent and act for us, and for each of us, in all matters concerning the collection of the said bonds of the Carolina Central Railroad Company, and the foreclosure and sale of the property mortgaged to secure said bonds. * * * In case a vacancy shall at any time occur in the said committee by death, resignation, or otherwise, such vacancy may be filled by the other members of said committee, or a majority of them, by the selection and appointment of a substitute, being a bondholder."

The second article authorizes the committee to purchase the road at the foreclosure sale.

The third reads as follows:

"*Third.* In case the said committee shall make the said purchase, * * * and when the same shall have been fully completed, they shall prepare and submit to the subscribers a plan or plans for the reorganization of

the said Carolina Central Railway Company, or for the reorganization of a new company, and any plan or plans, when so submitted and approved, and signed by subscribers hereto holding two-thirds in amount of said bonds, shall be binding on all of the subscribers; and the said committee shall have full power and authority to carry such plan or plans into effect."

On the eighteenth of May thereafter, before the time designated in the above paragraph, French drafted a plan of reorganization, Exhibit C, p. 63. This plan was circulated among the bondholders, and more than two-thirds, in the value of their securities, of the holders of "firsts" signed the following statement annexed to it:

" We, the undersigned, holders of Carolina Central bonds in amounts set opposite our names, respectively, hereby authorize the construction committee to carry out the foregoing plan of reorganization."

It is this plan that the plaintiff demands shall be specifically executed. By it there were to be issued two million of new first-mortgage bonds, and one million five hundred thousand seconds, which were to be income bonds. The holders of the three million old trusts were to receive 60 per cent. of the face of their bonds in new firsts, and 40 per cent. in new seconds; the remaining firsts and seconds to be held in the treasury for construction, equipment, etc.

The holders of the old firsts were also to receive three millions of stock, "to be held by the reconstruction committee"—that is, the committee created by the bondholders' agreement—"for five years from November 1, 1879, in trust for the holders of new first-mortgage bonds; * * * but the same may be issued sooner, when full interest upon second mortgage shall have been paid, upon request in writing of two-thirds in amount of the first-mortgage bondholders." There were also to be one million five hundred thousand new third-mortgage bonds, to be given to the holders of the old seconds, after paying in such new thirds a note held by plaintiff. These were, like the seconds, to be income bonds, and not cumulative.

On the thirty-first of May, 1880, the reconstruction committee bid off the road at the foreclosure sale for $1,200,000. The sale and bid were duly confirmed, and on the twenty-ninth of June a deed was made by the commissioners.

After the purchase had been fully completed, the defendant French, on the ninth of July, 1880, reported a new plan of reorganization, and this plan was adopted at a bondholders' meeting held in New York on that day. A vote of $2,471,600 is reported as having been given for this plan, but of this amount 1,000 bonds were those of the plaintiff, and were voted upon by French. This plan is the one under which, with some variations, the company actually reorganized. Exhibit F, p. 71.

The amount of the various mortgage bonds, and their distribution, is the same as in plan, Exhibit C; the change made was in reducing the amount of the stock to one million five hundred thousand and annexing it to the new seconds. This plan gave the plaintiff the

same proportion of the whole stock that she was to have received under the former plan. The nominal amount was less; or, to speak accurately, her 1194-3000 of the stock of the road was represented by a smaller number of shares than before. There was also this change made in the definition of the term "income," viz., an addition of these words: "All questions of expenditures within discretion of the board of directors." The stock was to be held, as before, by the committee for five years. A stockholders' meeting held at Weldon, on the fourteenth of July, adopted this new plan, with an addition to the definition of "income." By it, the term "income" was to include the cost of purchasing from time to time such real and personal property as might be deemed requisite for the more convenient management of the road. It was also provided that, in case of a dispute as to what charges were proper to be deducted from gross earnings in ascertaining net income, the decision of the board of directors should be final. After this reorganization, the company, with the co-operation of plaintiff, procured the passage of an act through the legislature of North Carolina, ratified a few days after the next meeting of that body. Chapter 5, Laws 1881. This act declares the Carolina Central *Railroad* Company a lawfully organized company. The name of the old corporation was the Carolina Central *Railway* Company.

These preliminary facts are necessary to an understanding of the contentions of the parties to the action. They are undisputed ones, as we believe. Other facts, about which there is controversy, can be more conveniently stated hereafter. This case was fully argued before us at Wilmington, in November last, upon a motion for a receiver. It was again fully argued at this term, and, at the last argument, we reheard matters that we had already passed upon in our decision denying the motion for a receiver. As our opinions remain unchanged upon these points, in the case heretofore decided, we will not incumber this opinion by a discussion of those propositions discussed in the opinion already filed by the circuit judge, (15 FED. REP. 691,) but will simply refer to them as adjudicated. It has been decided by us, among other things, that Mrs. Matthews has acquiesced in the present organization of the road, and that she is not now entitled to ask for a reconstruction of the corporation. There is, however, one view of the case strongly pressed upon us, in the learned and able brief filed by Messrs. McRae & Strange, which was not entered into in our opinion, and although we, in effect, decided against it, when we held that the plaintiff was bound to the new organization by her husband's conduct, yet we wish now to state why we cannot assent to it. It is the proposition that the plaintiff stands in a different relation in this controversy than she would otherwise have done, by reason of her *status* as a married woman. We will here correct one misapprehension of counsel. It was assumed that we held, in our opinion, that Mr. Matthews was the real owner of the

securities of the Carolina Central Railway Company now in litigation. We are not in a position to determine the merits of the action now pending in New York between the assignee in bankruptcy of Edward Matthews and Mrs. Matthews and others, in which that question is raised; nor is its determination at all necessary to the decision of this action. We have expressed no opinion upon the subject. We stated that this action could be discussed as if Mr. Matthews was the plaintiff, because we held that he is so fully the plaintiff's attorney that whatever he does or says binds her. He alone has done all that has been done in plaintiff's behalf in the reorganization, and she has only appeared at rare occasions, and in his presence, to ratify any act of his requiring her signature. But the plaintiff's contention is that, even assuming Mr. Matthews to have been the plenary agent of the plaintiff, yet, that (1) a married woman is not the subject of the law of either laches or estoppel;  *  *  *  (2) that the subject of this controversy is properly situated in North Carolina, and the reorganization of the road is a North Carolina contract, and that, by the law of North Carolina, a married woman can create no charge upon her property without the *written* consent of her husband.

We think that the argument is stronger against acquiescence than against estoppel. It is undoubted law that a married woman may be bound by an estoppel, even where she has no power to bind herself by a contract. "The cases all concur," says RODMAN, J., in *Towles* v. *Fisher*, 77 N. C. 437, "that a married woman, who is under a disability to contract, cannot be estopped by anything in the nature of a contract. To estop a married woman from alleging a claim to land, there must be some positive act of fraud, or something done upon which a person dealing with her, in a matter affecting her rights, might reasonably rely, and upon which he did rely and was injured." But we have put our decision on the ground of acquiescence.

Acquiescence—that is, assent—is tantamount to an agreement. It is an implied contract, and it requires for its validity the power to contract.

"A *feme covert* is *sui juris* as regards property settled to her separate use in possession, where there is no restraint against anticipation. Whether the separate estate of a married woman, who is restrained anticipation, can be affected by her acquiescence, appears at present unsettled." Lewin, Trusts, 777.

By the North Carolina decisions, however, (*Frazier* v. *Brownlow*, 3 Ired. Eq. 237; *Knox* v. *Jordan*, 5 Jones, Eq. 175, 177,) the English doctrine, that a married woman was *sui juris* as to her separate property, was, as it has been in most of the states, limited, and the law here was that, to bind her separate estate, she must expressly contract with reference to her separate property, and her trustees must assent. Of course, she could not by any contract bind herself personally.

The constitution of North Carolina of 1868 gave married women a legal estate in their separate property. It left them, as before, incapable of binding themselves personally by their contracts, and a married woman is still compelled, in order to affect herself, to in some way charge her separate property.

The words of the present constitution are that "the real and personal property" of the wife "shall remain her separate estate, * * * and may be devised and bequeathed, and, with the written assent of her husband, *conveyed*, by her as if she were unmarried." The act of 1871–2 (Battle's Revisal, *c.* 69, § 17) reads: "No woman during her coverture shall be capable of making any contract to affect her real or personal estate without the written consent of her husband."

Since the new constitution, it has been held that a married woman's separate property is not bound by her bond as surety for her husband, even though the husband's assent be expressed in writing, when there is no specific attempt to charge such property on the bond. *Pippen* v. *Wesson*, 74 N. C. 437.

It has also been held that a married woman could not bind her separate property in any form without the written consent of her husband. *Harris* v. *Jenkins*, 72 N. C. 183. In the case last cited we assume that Mrs. Harris had specifically charged her separate property, as otherwise the case would fall directly under the principle in *Pippen* v. *Wesson*, and the bond would have been inoperative, even with the husband's written consent.

*Harris* v. *Jenkins* is direct authority for the proposition that in North Carolina a married woman's disability to dispose of her property without her husband's written consent extends to indirectly disposing of it by binding it by her contracts. But there are two cases in which she may seek to bind it,—one when the charge is not for the benefit of her separate estate. It is to such a case only that the authority of *Harris* v. *Jenkins* applies. There is no decision on the other case of a contract made by her for the benefit of her separate estate without her husband's written consent.

We should be inclined to say that any legislative restriction upon her right to contract in managing her property would be a restriction of the right of separate property given her by the constitution. The supreme court of North Carolina, in *Kirkman* v. *Bank of Greensboro*, 77 N. C. 394, has decided that the restriction of article 10, § 6, of the constitution of North Carolina, does not operate to prevent married women from receiving and reducing to possession their property without the written consent of the husband; and READE, J., in the case expressly declines to consider the power of the legislature to restrict the wife's rights in property under the constitution, because, as he says, the constitution and the statute mean the same thing.

We are of the opinion that a married woman may manage and control her property under the laws of North Carolina without making her husband her bailiff, and may, in doing so, incur and render

her separate property liable to such charges as are proper to its management.

In equity a married woman could only sue by a next friend, and the reason was that there might be some one responsible for costs. Now, in North Carolina she may sue by herself with respect to her separate property, and it would seem that she would by so doing charge her separate property with the costs. However this may be, the case of *Manning* v. *Manning*, 79 N. C. 293, is direct authority for the right of a wife to sue alone. In that case she successfully maintained ejectment against her husband for her land. If she has the right to sue, she has the right to control the suit. Our conclusion is that had the plaintiff been a resident and domiciled in North Carolina she would have had, by virtue of her ownership, the right to manage and control her Carolina Central bonds. She would have had the right to sue upon them. The right to sue would have included the right to control the suit. She could in good faith have compromised it. She could have made any terms to arrange its results, and she could have not only consented to one plan of reorganization, but to any plan that she thought advantageous as a substitute for it; and this, although it might change the form of her securities, or lessen their nominal amount and value. But, while the *locus* of the property is in North Carolina, the domicile of the plaintiff is in New York.

The North Carolina law must govern as to the construction of the contract, for it is the place of solution,—the place with a view to whose law it was made. It must govern as to the form of the remedy, for the law of the forum controls that. But as to the ability of the party to contract, that depends upon the law of the domicile, when the question is one of personal ability or disability; and as to the form of entering into the contract, the law of the place where the contract is made must control; that is, in the last two points the law of New York is to be looked to. *Kent* v. *Dawson Bank*, 13 Blatchf. C. C. 237; *Pritchard* v. *Norton*, 106 U. S. 124; [S. C. 1 Sup. Ct. Rep. 102.] In New York there is no statute requiring the written consent of the husband to contracts to charge the wife's separate property, and a married woman can bind her separate property, either by making a contract for its benefit, or by expressly charging it in the contract. *Yale* v. *Dederer*, 22 N. Y. 450.

We pass to another branch of the case. The first prayer of the complaint asks for the removal of the trustees, and that the bondholders be allowed to appoint new trustees. By the bondholders, we suppose the plaintiff to mean the old firsts. These bondholders are not, as such,—many of them are not in any capacity,—before the court; and we have no power in their absence to do what the prayer demands. But assuming that, under the general prayer for relief, we might grant whatever relief the case warrants, we shall consider whether the plaintiff is entitled to the appointment by the court of new trustees.

Neither the laborious research of plaintiff's counsel, nor what labor we have been able to bestow on the case ourselves, has brought to light any case similar to that of the trust that we are called upon to enforce,—a trust for five years, to be exercised by a portion of the *cestuis que trustent*, with power to appoint successors from the *cestuis que trustent* upon resignation.

Three years and a half of the term has expired. Nearly the whole of it will have expired before this suit can be possibly determined in the supreme court; and the result of removing the present trustees would necessarily be, if it granted the relief desired by the plaintiff, to take the railroad in controversy for a few months at most out of its present control, which is that of a majority of its stockholders, and then at the end of those months return it to its present management; for, if the court stopped short of such return, it would do injustice, and would leave the recovery of the road by those who must ultimately be its possessors, to the end of a long and expensive suit.

Counsel for plaintiff, in their argument at this term, called our attention to the fact that on this point in the case its decision would practicably be final. The suggestion could not but turn our minds to a consideration of evils that would ensue were we, without any possibility of remedy by appeal, to change for so short a time the entire management of a long line of railroad, its officers, and other employes, its policy and connection, and unsettle, with no possible permanent good results, an important factor in the business interests of the state. Were this an action for the possession of land for a short unexpired term, we would doubtless be bound, upon the finding of a jury, to follow that finding as of strict right. But the parties to this action are in a court of equity,—a court bound to look carefully to the whole result of its discretionary action.

The relief given against a breach of trust is twofold: it is retrospective, in order to remedy the mischief already done; and, secondly, prospective, with a view to the prevention of further injury. Hill, Trustees, [*522.] Under the first head comes the following of property illegally disposed of, and capable of being followed *in specie*, account with trustees, charging them with interest, etc.; and in this the court enforces strict equitable rights, exercising discretion only in the question of interest.

Under the second head comes the removal of trustees and the appointment of new ones; and this depends upon the exercise of legal discretion. It is not every act amounting to a breach of trust which will induce the court to remove a trustee. The acts must be such as to endanger the trust property, or to show a want of honesty or capacity; and when the failure in duty has proceeded from misunderstanding, the court has refused to discharge them. Hill, Trustees, (*524.)

An attempt has been made to show to the court that the present

management is such as to endanger the trust fund. Perhaps what we have already said about the shortness of time to which the remedy sought would apply, would be a sufficient answer to this claim of the plaintiff; but, as a matter of fact, we have not been convinced by any legal proof that the present management is engaged in wrecking the road. It would be very difficult to come to a conclusion of this kind upon the results of a management that has had so short a time to develop itself in, as has the present one of the Carolina Central. Certainly, we ought to require something more definite than the comparison of one year's receipts with those of a preceding one. Too many elements enter into the annual receipts of a railroad to make such a test for any short period a safe one, and the present case is complicated by the fact that the road has just come out of the hands of a receiver, with road-bed, track, and rolling stock all to be renewed.

It is said by one of plaintiff's witnesses that the Seaboard system is a competing, and necessarily hostile, line as to that position of the Carolina Central between Hamlet and Wilmington. This may be so, and yet it may be a proper connecting and feeding line for the largest part of its mileage. However this may be, and whatsoever might be our opinion had we the power to legislate upon the question of allowing one railroad system to run another, which might be properly a competing line, we are not at liberty to legislate, and we cannot say that that shall not be done which the legislature of the state allows.

The act of August 15, 1868, § 4, allows any railroad company within the state to purchase stock in any other railroad company in the state. We cannot assent to the claim that a company allowed to purchase stock cannot vote upon that stock.

An ingenious argument has been made to convince us that the act of August 15, 1868, has been repealed. The power to purchase referred to is given in an act making an appropriation to a railroad company. It was passed at what is well known in North Carolina as the summer session of 1868. That session adjourned without day in the month of August, 1868, and the same legislature met in November the same year, and held what is also well known as the winter session of 1868–9. In the following year—1869 and 1870—the legislature repealed all the acts passed at the *last session* of the legislature making appropriations to railroad companies. The argument of counsel is that the summer session of 1868 and the winter one of 1868–9 were parts of one session. But the question is one of intention. The legislature did not mean by its act (Laws 1869–70, c. 71) to repeal any acts of what was always styled the summer session. The laws of the two sittings were published in separate volumes, and are always referred as the acts of the different sessions.

We hold the act of August 15, 1868, to be in force, in so far as it has not been declared unconstitutional by the supreme court of North Carolina, and that section 5 of that act is still the law of the land.

To hold that the control of one railroad company by a majority of its stock owned by another railroad company is ground for taking away that control, would be not to enforce but to nullify the law. Beyond the argument that it is to the interest of the Seaboard & Roanoke system to wreck the Carolina Central, and therefore it is wrecking it, and therefore the court ought to appoint a receiver or new trustees, we see very little in this branch of plaintiff's case. We can see that the management of the road takes less cotton to Wilmington, and that it is very probable that the road is run less in the interest of Wilmington than under the Murchison management; but we are not satisfied, by any evidence before us, that there is any attempt to run the road against its own interest. No system of charges for freight that would indicate this—no giving an unfair percentage to the other lines on the freight carried over both—is shown. The most that is claimed is that the great bulk of the cotton carried from the west is shipped north at Hamlet over the Raleigh & Augusta Air-line instead of being shipped at Wilmington. We cannot say that this is necessarily against the interest of the Carolina Central Railroad. We cannot say that the Carolina Central Railroad earns less by this arrangement than it would by the other, because we cannot tell whether or not the cotton could be profitably sent to Wilmington rather than to Norfolk. We do not know how the shipments would naturally be made by shippers. We cannot measure the inducements offered by rival lines.

It is a question of railroad policy that the evidence does not enable us to determine, and that in its nature must be almost beyond the reach of courts. The evidence that would induce a court to interfere in the control of a railroad corporation on the ground that it is not run in its own interest, must be clearer than that offered in this case.

We pass to the alleged breach of trust on the part of the former trustees involved in their resignations and appointment of successors. The original trustees have all, with the exception of Murchison, who is dead, resigned. Their successors have been appointed, in strict conformity with the terms of the trust, from among the new second-mortgage bondholders. The original trustees were also large holders of second-mortgage bonds, with the stock annexed. They pooled their bonds and sold them to Murchison & Co., and as a part of the sale they agreed to resign and allow Murchison to name their successors. The sale was a sale of a majority of the stock in the road, *and* of the control of the road, and the sale of the control immediately enhanced the price received for the bonds. They might have sold stock and control, and received a consideration for the control, had there been no trust.

Concede, for the sake of the argument, that the arrangement was a breach of trust, they being trustees and not mere bond and stockholders. The same process was repeated when Murchison sold out.

The Murchison trustees resigned, and the Seaboard & Roanoke trustees came in. Now, the question of what the court ought to do is not to be necessarily answered by conceding that there has been a violation of duty on the part of the trustees. We recur to the law extracted from Hill on Trustees: "The acts must be such as to endanger the trust property, or to show a want of honesty or capacity; and when the failure in duty has proceeded from misunderstanding, the court has refused to discharge them." Two sets of trustees have resigned. We have been shown nothing to indicate a want of capacity or honesty in the present trustees. As to the original trustees, if there has been a failure of duty, and it has arisen out of misapprehension or a misunderstanding of the trust, it would be no ground for their removal, and therefore no ground for the removal of their appointees.

Was the trust so clearly written as to make a transfer of the trust to the purchasers of a majority of the stock a plain breach? A trust so unusual as to be, as far as we know, without a precedent, expressed in terms so meager as simply to say that a certain committee should hold certain stock for five years, without one word about whose interests they are to protect, or how, and with such unrestrained powers of substitution, may well have been the subject of misapprehension on the part of the trustees.

It is evident that Edward Matthews did not originally suppose that the control of the road could not be turned over to a purchaser of a majority of its stock. In his letter of August 18, 1880, (p. 339,) he says to John M. Robinson, the president of the Seaboard & Roanoke Railroad Company:

"I beg to confirm in writing what I said to you in Paris, that I would reduce my offer for the sale of 7,600 shares of stock from $350,000 to $300,000: but, in regard to the other two offers, I wish you to consider them as my *ultimatum*, and under no circumstances can I make one dollar's reduction, as in either offer you get in stock what is intrinsically worth more than you pay, and the *control* of the *road* will really cost you nothing. * * * Our road is the natural outlet of the air-line company's line, and I am confident that sooner or later they will realize it, and be glad to make some running arrangement, if not to purchase, unless I sell the control to you."

In the letter of September 16, 1880, (p. 341,) to Mr. Robinson, Mr. Matthews says:

"At any rate, I would sell you a majority of the stock, and would *give* you a *control* of the road, and those who refused to sell before would be glad to sell after they knew that it had passed under your control, as they would not wish to own a minority when another road or roads control."

In his letter to Robinson of November 26, 1880, (p. 348,) he says: "I made you, when here, a definite offer to sell you the control, and the $1,500,000 new third-mortgage bonds for $600,000;" and on December 4th, (p. 350,) he restates the same offer, and says: "If you do not buy the third mortgage, I should want assur-

ance that the road would be run in the interest of the Carolina Central Railroad. * * * If you buy the third mortgage I shall require no condition, because you will be interested."

The defendant trustees say that it was only after they had discovered that Matthews was trying to sell a control to Robinson that they pooled their stock with that of others, so as to effectively prevent Matthews from doing so, and it was after that discovery that they sold to Murchison & Co. How Matthews could have delivered control for the ensuing few years, even had he secured a majority of the seconds, it is hard to say. The majority did pass the control by a change in the trustees. We do not think that, even if they did what the trust did not allow, they did it with such dishonesty as to brand them as incapable of holding positions of trust; and *a fortiori* we do not think such incapacity attached to the third set of trustees, who, at the most, merely accepted the positions left vacant by their resignations. We hold that the case, at the most, comes under the head of misunderstanding, and this we are the more inclined to do, as we have ourselves experienced great difficulty in understanding the trust. We do not know what may have been the purposes of the different parties to the creation of the trust. The plaintiff's agent may have expected to protect his third-mortgage bonds by it; the other bondholders may have devised it to protect themselves against the plaintiff, and prevent her from obtaining an immediate control of the road. But if we look only at the terms of the trust itself, meagerly as it is expressed, there is enough in it to show that it was so *written* as to make a trust for the benefit of the holders of the new second-mortgage bonds, and of them only. This clause, the only one indicating the purpose of the trust, shows it: "But the same may be distributed sooner, when full interest upon second mortgage shall have been paid," upon request, and so forth. The purpose indicated is that there should be no separation of the stock from the second-mortgage bonds for five years, so that the direction of the road should be determined by the holders of those bonds, with a view to the road being so controlled as to earn income for this class of bonds. The fact that the trust might be determined by two-thirds of the second-mortgage bondholders when interest should be earned upon that mortgage, no reference being made to earning income for the third, seems very strong evidence of the correctness of this view of the trust,—the one presented by Mr. E. R. Robinson in his brief.

The plaintiff's last contention is a claim that she is the equitable owner of the 615 bonds sold by the pool to Murchison & Co., and by D. R. Murchison to the Seaboard & Roanoke Railroad Company. Her prayer is that the latter corporation or Murchison be declared her trustee for these bonds, with the annexed stock. To this claim the defendant pleads an estoppel of record.

On the twenty-ninth of October, 1881, the present plaintiff brought an action in the supreme court of the city and county of New York

against the firm of Murchison & Co. for the bonds in question. By her complaint in that action she demanded judgment against defendants for the possession of said bonds, or damages. A final judgment, stated on its face to be upon the merits, dismissing the action, was rendered on the twenty-sixth of January, 1882.

It is contended by the plaintiff that the New York action was an action at law of the nature of an action of *detinue*, and that it is no bar to the relief demanded in this bill in equity; that the former action asserted a legal and this an equitable title to the bonds; that Mrs. Matthews might not be the legal owner of the bonds, and so might not be entitled to maintain an action at law for them, and yet might be entitled to sue for them in chancery; and that, therefore, a judgment for plaintiff in this court upon the present cause of action might well stand with the judgment against her in the New York court.

As one of the members of this court entertains this view, and as we agree that the plaintiff has no right upon its merits, either at law or equity, to the bonds in question, we prefer to put our decision on the ground on which we stand together. The burden of proving that Murchison & Co. purchased the 615 bonds for the plaintiff rests upon her. Such a purchase is evidenced by not a scrap of writing; and Mr. D. R. Murchison's claim, that "if there had been any such arrangement we should surely have had it in writing," seems reasonable.

It is difficult to conceive that Murchison & Co. agreed to bind themselves to undertake a liability of upwards of half a million of dollars without any writing which would bind the plaintiff, and without any security for the money to be disbursed. It would take convincing evidence to satisfy us of this, and there is no such evidence. None exists in the correspondence. There can be no doubt but that Murchison & Co. had undertaken to purchase for plaintiff a number of bonds in aid of her effort to secure a controlling interest in the road.

On the second of April, 1881, Matthews wrote to Murchison: "Our only way is to buy 85 second-mortgage bonds. I am willing to buy one-half of them, or all." On the thirtieth of April, Murchison wrote: "If you will keep quiet, others can no doubt buy the bonds; think we can." On the twenty-sixth of June he wrote to Matthews that all the holders of seconds had combined, and that they would accept 110 for 600 seconds. As late as July 13th he wrote: "If the pool breaks, we will buy the fifty bonds at once;" meaning, as we suppose, for the plaintiff. When it became evident that it was impossible to buy any small number of bonds, that undertaking necessarily fell through. This was evident in July, 1881. We know of nothing to have prevented Murchison & Co. from buying the pooled bonds for themselves. It is evident that if they had not done so, Robinson would. Certainly, Murchison & Co. would not have been authorized, under a

commission, to buy enough bonds to make, with what plaintiff then had, a majority—to buy 615 bonds. This would have required, instead of say fifty, over five hundred thousand dollars. If they were ever employed to buy these, it was at the meeting of the second of July, 1881. The previous correspondence is irrelevant to what then happened. The whole evidence upon that subject is in brief compass. Edward Matthews swears that on that day W. F. Sorey, of the firm of Murchison & Co., asked him whether, "if they could not buy part of the bonds without buying all," affiant would take all, and affiant replied that he would. Price, it is stated, was mentioned, but it is not stated that then, or at any other time, anything was said about raising the large sum required for the purchase. Watson Matthews (p. 149) confirms this statement, and Mr. Roberts, (p. 160.)

We should find it difficult from this to find that concurrence of mind that makes a binding contract. But against it stands the denial of Sorey, the testimony of Murchison that he had just told Matthews that he should act solely and entirely for his firm in buying the bonds, the improbability of so large a transaction being so loosely undertaken, and the letters of Edward Matthews, which seem inconsistent with the existence of such an undertaking. On the twenty-ninth of July, 1881, Murchison & Co. wrote to Matthews that they had purchased the 616 bonds on their own account. It is natural to look to Matthews' reply to see whether he immediately claimed the bonds as his. He wrote on the 30th:

"I supposed that I was to have part of the purchase. I think you ought, under the circumstances, to treat me frankly, and inform me what you paid, and who is associated with you in the purchase, if any one, and inform me what your plans are."

On the next day Watson Matthews wrote to his brother, Edward:

"I do believe that you will be called on sooner or later to buy these bonds, at a considerably higher price than Murchison & Co. paid for them, or they will be sold to other parties; but you can do nothing."

On the thirtieth of July, Matthews writes to Murchison & Co. a letter, introduced in Sorey's affidavit, which is also clearly inconsistent with any claim to the bonds. We think the preponderance of testimony is very strong against the claim that the plaintiff is the owner of the 615 bonds, in either law or equity.

The pleadings and evidence in this suit are voluminous; the printed arguments submitted to us have been even more extended than the record.

This opinion is longer than we would wish it, but we have endeavored to cover all the material points in the case. If any have been omitted, it has not been through any failure on our part to examine the whole of the immense mass of papers presented to the court.

BOND, J., concurs.